

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-13-00051-CR

_____

MICHAEL PERRY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 188th District Court
Gregg County, Texas
Trial Court No. 42,139-A

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

Witnesses described Michael Perry's intoxication at his residence one evening and Perry's violent anger at his niece, Alanna McKinney—also a resident of the Perry household—after McKinney locked herself inside her room in an apparent effort at self-protection from Perry. Witness reports included these actions by Perry when faced with the locked door: repeatedly yelling, "Bitch, open the door," kicking down the door, advancing toward McKinney with a knife in hand, threatening to stab her, struggling with her, and punching her repeatedly. Perry, who had various prior convictions, was convicted by a Gregg County jury of one count of assault family violence with prior family violence and one count of aggravated assault with a deadly weapon, the knife.[1] He appeals on a number of grounds.

We modify the trial court's judgment by removing attorney fees, but otherwise affirm the judgment. We reach that conclusion for the following reasons:

1. Sufficient evidence supports Perry's convictions.

2. Perry was not subjected to double jeopardy with the two charges.

3. Perry was not entitled to any lesser-included-offense instruction.

4. Evidence of Perry's prior offense of family violence was admissible.

5. Perry was not entitled to a mistrial based on the State's opening statement mentioning his prior family violence conviction.

6. Admitting McKinney's accusatory statement through another witness was not error.

---

[1]Perry received enhanced sentences of sixty years' imprisonment and was fined $10,000.00 on each count. He was also ordered to pay $324.00 in court costs and $5,100.00 in attorney fees.

7.      No error was preserved regarding the claimed breach of agreement regarding the knife.

8.      No error was preserved regarding the lack of a jury instruction regarding the knife.

9.      Perry's sentences were not constitutionally excessive.

10.     No ineffective assistance of counsel was shown.

11.     Attorney fees must be removed from the judgment.

We explain these conclusions in that order.

*1.     Sufficient Evidence Supports Perry's Convictions*

In evaluating legal sufficiency of the evidence, we must review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found, beyond a reasonable doubt, that Perry was guilty of both assault family violence with a prior conviction of family violence and aggravated assault with a deadly weapon. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App.

1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*. As previously stated, under count I, the State was required to prove that Perry (1) intentionally, knowingly, or recklessly, (2) caused bodily injury to McKinney, (3) that McKinney was a member of Perry's household, and (4) that Perry was previously convicted of assaulting a family member. *See* TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(2) (West Supp. 2014); TEX. FAM. CODE ANN. § 71.005 (West Supp. 2014). Under count II, the State was required to prove that Perry (1) intentionally, knowingly, or recklessly, (2) threatened McKinney with imminent bodily injury, and (3) used or exhibited a deadly weapon during the commission of the assault. *See* TEX. PENAL CODE ANN. § 22.01(a)(2) (West Supp. 2014), § 22.02(a)(2) (West 2011).

Perry is McKinney's uncle. They lived together in the same house with McKinney's grandmother, Perry's mother, and McKinney's friend, Dawn Ayers. On the day of the incident, McKinney and Ayers invited their friend, Oajuntae Dominique Johnson, and Ayers' boyfriend, Chase Jermaine Neal, to hang out in McKinney's room. The party continued late into the night.

Johnson, Ayers, and Neal testified that Perry (1) had a history of violence fueled by intoxication, (2) was intoxicated that night, and (3) kept coming into McKinney's room in an attempt to include himself in their conversation.[2] According to Johnson, McKinney locked the

---

[2]Johnson and Neal testified that Perry was in possession of pills of some kind.

door to her room because Perry was repeatedly asking the group for crack and because Johnson and McKinney were aware of Perry's propensity for violence when intoxicated.

By Johnson's account, Perry returned five minutes after the door was locked, became angry that McKinney had locked the door, and yelled, "Bitch, open the door; bitch, open the door." Johnson, Ayers, Neal, and McKinney testified that Perry, who was holding a knife, kicked down the door after McKinney failed to open it. The witnesses' accounts of how Perry was holding the knife differed. According to Johnson, Perry advanced toward McKinney with a knife, "like he was fixing to stab [McKinney] with it," and said, "Bitch, I'm fixing to stab you." Neal demonstrated how Perry held the knife, and the State described the demonstration as "not down but kind of maybe at his waist." Ayers initially said she could not recall how Perry held the knife, but stated during cross-examination that the knife was by Perry's side. She was unsure of how Perry was holding the knife because her attention was diverted when Perry and McKinney began fighting.

Johnson and Neal testified that McKinney grabbed Perry's hand and wrestled for the knife while Perry was punching her in the ribs. Ayers and Neal testified that Perry and McKinney were fighting each other and that Perry was punching McKinney forcefully. McKinney succeeded in getting the knife away from Perry. Perry next put McKinney in a headlock, and the fight continued. Ayers could not describe where the blows landed because "[t]hey were punching each other so many times."

Neal testified that he broke up the fight, that Johnson picked up the house telephone to call the police, and that Perry hit Johnson in her face, causing her to hang up the telephone.[3] Johnson then ran outside to call the police from her cell phone. Officer Nikki Jean Williams with the Longview Police Department testified that she pulled up at the house to find "a white male walking away from the house and a black female pointing and saying, 'That's him, that's him.'" Johnson testified that she told the responding police officer what happened, pointed to Perry as a suspect, and watched as Perry was arrested.

Williams knew that a knife had been involved in the incident and restrained Perry for her safety. According to Williams, Perry was intoxicated and agitated. After handing Perry over to another officer, Williams began taking the witnesses' statements. Williams testified that McKinney was shaking, upset, and "was almost at one point hysterical." While in this state of excitement, McKinney told Williams that Perry kicked down the door, came at her with a knife, and hit her approximately eight times in the head.

At trial, McKinney told a different story than the one recalled by her friends. During a jailhouse call, McKinney told Perry that she would try to help him with her testimony in any way that she could. McKinney kept her promise by attempting to testify in Perry's favor and stating, "I don't want my uncle [d]oing 25 to life." She claimed that her grandmother did not approve of Neal and that Perry broke the door to her room in an effort to force Neal to leave the house. McKinney claimed that Perry did not attack her and held the knife by his side instead. As

---

[3]Neal testified that an unnamed friend, who was also at the gathering, left before police arrived because "he couldn't be around all that stuff that was going on."

6

promised to Perry in the jailhouse conversation, McKinney testified that Perry could have used the knife to open the door.

Although McKinney denied feeling threatened with the knife, she testified that she grabbed Perry's hand that was holding the knife, that Perry had her in a headlock, that they struggled, and that a hole in the wall resulted from their wrestling. The State asked why McKinney grabbed Perry's hand if she did not feel threatened and if Perry had not advanced toward her or any of her friends, and McKinney simply responded, "I don't know." McKinney also could not remember whether Perry was hitting her during the struggle and claimed that the incident affected her only emotionally, not physically.[4]

Contradicting McKinney's testimony, Johnson testified that she saw scratches on McKinney's face, a little knot on the back of her head, and that McKinney told her that she was in pain. Johnson believed that Perry's blows would have resulted in pain. Williams also testified that McKinney claimed to be in pain from the attack. According to Williams, "there was a slight red mark on [McKinney's] face," and McKinney "said [that,] during the course of the assault[,] her lip got busted." Williams photographed McKinney's face after the attack. The photographs were displayed for the jury, but Williams testified that she could not see any scratch on McKinney's face due to her severe acne and that it did not appear that her lip was swollen although injury to the lip was visible. McKinney testified that the injury to her lip could have been a fever blister.

---

[4]McKinney testified that, although Perry had not done anything wrong, he packed his backpack and was about to leave when the police arrived.

Citing to McKinney's testimony that she was not hurt, Perry argues that the evidence was insufficient to establish family violence because the State failed to prove that bodily injury was caused.[5] Perry also argues that Johnson's testimony supported McKinney's claim. Johnson testified that, although Perry hit her while she was calling the police, the blow did not hurt her.

However, Johnson also testified that she would have been in physical pain if she had sustained the blows McKinney suffered during the fight. Several witnesses testified to, and photographic evidence suggested, facts that supported findings that McKinney experienced pain.

The jury was well aware of McKinney's promises to Perry to testify in his favor. Reconciliation of evidentiary conflicts is solely a function of the trier of fact. *Pierson v. State*, 398 S.W.3d 406, 421 (Tex. App.—Texarkana 2013), *aff'd*, 426 S.W.3d 763 (Tex. Crim. App. 2014); *Mosley v. State*, 983 S.W.2d 249, 254 (Tex. Crim. App. 1998). As the judge of witness credibility, the jury was free to reject McKinney's testimony and believe Johnson's account. Viewing all of the evidence in a light most favorable to the verdict, we find that the evidence was legally sufficient to prove that Perry, who was previously convicted of assault family violence, intentionally, knowingly, or recklessly caused bodily injury to McKinney, a family household member.

Perry advances two arguments with respect to the aggravated assault count. First, Perry argues that the evidence was insufficient to establish that he threatened McKinney with imminent bodily injury because McKinney claimed that she was not threatened by the knife and

---

[5]Perry's prior conviction for family violence was admitted at trial. Perry admits that McKinney was a member of his household and that he was previously convicted of assaulting a family member. *See* TEX. PENAL CODE ANN. § 22.01(b)(2); TEX. FAM. CODE ANN. § 71.005.

8

some evidence showed that he did not hold the blade in her direction. Second, Perry argues that the evidence did not establish that the knife was a deadly weapon.

Although all of the witnesses testified that Perry was angry and came through the door with a knife, witness testimony on the position of the knife in Perry's hands varied. Ayers, who initially claimed to be distracted and unsure of how Perry held the knife, testified during cross-examination that the knife was at Perry's side. Neal's demonstration to the jury indicated that Perry held the knife "not down but kind of maybe at his waist." However, Johnson testified that Perry advanced toward McKinney with a knife, "like he was fixing to stab [McKinney] with it," and said, "Bitch, I'm fixing to stab you." The evidence, including McKinney's testimony, established that McKinney grabbed the hand in which Perry was holding the knife and held it up during the fight until Perry eventually dropped the knife.

A steak knife was admitted for demonstrative purposes after witnesses testified that the knife was similar to the one used by Perry during the incident. William Jennings, with the Gregg County Sheriff's Office, testified that a knife is capable of causing death or serious bodily injury and was considered a deadly weapon.[6] Because a knife is not a deadly weapon per se, the State was required to prove that the knife, in the manner of its use or intended use, was capable of causing death or serious bodily injury. *See Blanson v. State*, 107 S.W.3d 103, 105 (Tex. App.—Texarkana 2003, no pet.); *Jackson v. State*, 913 S.W.2d 695, 697 (Tex. App.—Texarkana 1995, no pet.). To meet this burden, the State was required neither to introduce the knife nor to show that the knife actually inflicted injury. *Jackson*, 913 S.W.2d at 698. Instead, the jury was free to

---

[6]The record does not clarify whether Jennings was shown the demonstrative knife. It appears that Jennings generally testified that a knife is a deadly weapon.

consider the facts of the case, including Perry's words, in deciding whether the knife was a deadly weapon.

There was a consensus among the witnesses at trial that Perry possessed a propensity for violence when intoxicated. Unable to control himself in his intoxicated state, Perry kicked down the door to McKinney's room simply because he had been locked out. Photographs depicting the extensive damage to the door were shown to the jury. Despite McKinney's testimony, the damage to the door suggests that Perry did not wield the knife simply to open the lock on the door. Johnson testified that Perry advanced toward McKinney with the knife after declaring that he would stab her. McKinney claimed at trial that she was not threatened with the knife. Yet, she felt compelled to grab Perry's hand in an attempt to prevent being injured by the knife, and Williams testified that McKinney "was almost at one point hysterical."

The evidence of Perry's declaration of his intention to stab McKinney with the steak knife demonstrated that the knife, in the manner of its use or intended use, was capable of causing death or serious bodily injury. Therefore, viewing the evidence in the light most favorable to the verdict, we find the evidence legally sufficient to support the jury's determination that Perry intentionally or knowingly threatened McKinney with imminent bodily injury and exhibited a deadly weapon during the assault.

Because we find the evidence legally sufficient to establish the jury's findings on both counts of the State's indictment, we overrule this point of error.

10

*2.      Perry Was Not Subjected to Double Jeopardy with the Two Charges*

The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Article I, Section 14 of the Texas Constitution protect individuals from being tried and/or punished twice for the same offense.  U.S. CONST. amend. V, TEX. CONST. art. I, § 14; *Albernaz v. United States*, 450 U.S. 333, 343 (1981); *Illinois v. Vitale*, 447 U.S. 410, 415 (1980); *Stephens v. State*, 806 S.W.2d 812, 814–15 (Tex. Crim. App. 1990).  The double jeopardy guarantee against multiple punishments for the same offense is designed, in part, to prevent a sentencing court from prescribing greater punishment than the Legislature intended.  *McCrary v. State*, 327 S.W.3d 165, 171–72 (Tex. App.—Texarkana 2010, no pet.) (citing *Missouri v. Hunter*, 459 U.S. 359, 366 (1983); *Ex parte Kopecky*, 821 S.W.2d 957, 959 (Tex. Crim. App. 1992)).  The prohibition against double jeopardy is also designed to protect an accused individual from the "embarrassment, expense and ordeal" of multiple trials for the same offense, "compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that[,] even though innocent[,] he may be found guilty."  *Green v. United States*, 355 U.S. 184, 187–88 (1957).  Conversely, "[a]n accused may be punished for two offenses that would be regarded as the same offense if the Legislature has manifested its intention that he should be."  *McCrary*, 327 S.W.3d at 172 (citing *Littrell v. State*, 271 S.W.3d 273, 276 (Tex. Crim. App. 2008)).

"The 'same elements' test first articulated by the United States Supreme Court in *Blockburger v. United States* is used to determine if two convictions constitute 'multiple punishment' under the Double Jeopardy Clause."  *Langs v. State*, 183 S.W.3d 680, 685 (Tex. Crim. App. 2006) (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).  "The

11

applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions[,] the test to be applied to determine whether there are two offenses or only one[] is whether each provision requires proof of a fact which the other does not."[7] *Id.*

Thus, when the same conduct violates more than one distinct penal statute and each statute requires proof of a fact that the other does not, it is presumed that the two offenses are not the same and that the Legislature intended to authorize multiple punishments. *McCrary*, 327 S.W.3d at 172 (citing *Hunter*, 459 U.S. at 366; *Blockburger*, 284 U.S. at 304); *see Phillips v. State*, 787 S.W.2d 391, 394 (Tex. Crim. App. 1990). But, "if all the elements of one statutory offense are contained within the other, it is presumed that the two offenses are the same and that the Legislature did not intend to authorize punishment for both." *McCrary*, 327 S.W.3d at 172 (citing *Whalen v. United States*, 445 U.S. 684, 693–94 (1980)).

Here, Perry's convictions arose from the same conduct, and the State alleged that the same conduct violated two distinct penal statutes. Thus, we must examine whether the Legislature intended to authorize multiple punishments for the offenses alleged in the State's indictment based on the language of the indictment. *Garfias*, 424 S.W.3d at 61. Count I of the State's indictment alleged that Perry, who had previously been convicted of assaulting a family member, again committed the offense of assault family violence by hitting and intentionally, knowingly, or recklessly causing bodily injury to household member McKinney. Count II of the indictment alleged that Perry intentionally or knowingly threatened McKinney with imminent

---

[7]A multiple-punishments claim can arise either in "the lesser-included offense context, in which the same conduct is punished twice; once for the basic conduct, and a second time for that same conduct plus more (for example, attempted assault of Y and assault of Y; assault of X and aggravated assault of X)" or "when the same conduct is punished under two distinct statutes where the Legislature only intended for the conduct to be punished once." *Langs*, 183 S.W.3d at 685; *Garfias v. State*, 424 S.W.3d 54, 58 (Tex. Crim. App. 2014).

12

bodily injury by holding the blade of a knife—a deadly weapon—in her direction. Perry argues that his convictions for assault family violence with a prior conviction and aggravated assault with a deadly weapon subjected him to multiple punishments for the same offense.

Under count I, the State was required to prove (1) that Perry intentionally, knowingly, or recklessly, (2) caused bodily injury to McKinney, (3) that McKinney was a member of Perry's household, and (4) that Perry was previously convicted of assaulting a family member. *See* TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(2); TEX. FAM. CODE ANN. § 71.005. Under count II, the State was required to prove that Perry (1) intentionally, knowingly, or recklessly, (2) threatened McKinney with imminent bodily injury and (3) used or exhibited a deadly weapon during the commission of the assault. *See* TEX. PENAL CODE ANN. §§ 22.01(a)(2), 22.02(a)(2). Whereas count I required proof that injury was caused and that Perry was previously convicted of assaulting a family member, count II did not require such proof. Whereas count II required proof that Perry used or exhibited a deadly weapon in threatening McKinney with imminent bodily injury, count I did not require a deadly-weapon finding and instead required proof that injury was caused, not merely that it was threatened. Because each count required proof of facts that the other did not, we presume that the two offenses are not the same and that the Legislature intended to authorize punishments under both. *See McCrary*, 327 S.W.3d at 172; *Phillips*, 787 S.W.2d at 394.

While the *Blockburger* test establishes a presumption, it is only the starting point of our double-jeopardy analysis. *Garfias*, 424 S.W.3d at 58. We must consider

> whether [the] offenses are in the same statutory section; whether the offenses are
> phrased in the alternative; whether the offenses are named similarly; whether the

13

offenses have common punishment ranges; whether the offenses have a common focus; whether the common focus tends to indicate a single instance of conduct; whether the elements that differ between the two offenses can be considered the same under an imputed theory of liability that would result in the offenses being considered the same under *Blockburger*; and whether there is legislative history containing an articulation of an intent to treat the offenses as the same or different for double-jeopardy purposes.

*Id.* at 59 (citing *Bigon v. State*, 252 S.W.3d 360, 370 (Tex. Crim. App. 2008); *Ervin v. State*, 991 S.W.2d 804, 814 (Tex. Crim. App. 1999)).  We also look to the allowable unit of prosecution under the statutes.  *See id.* ("One other factor reviewing courts should consider when making an 'elements' analysis is the determination of the allowable unit of prosecution for the offenses in question.  Although such a determination is a necessary step when a multiple-punishments claim deals with two offenses from the same statutory section, we have stated that, even in an 'elements' analysis, such a determination can be indicative of legislative intent.").

Here, the State's alleged offenses are contained within separate statutory sections.  As alleged,[8] (1) the offenses are not phrased in the alternative, (2) assault family violence and aggravated assault with a deadly weapon, although both assaultive offenses, are not named similarly, (3) assault family violence is a third degree felony, whereas aggravated assault is a second degree felony, (4) the focus or gravamen of the family violence count was on the actual harm inflicted to a victim in the same household, whereas the aggravated assault offense count focused on threatening conduct with a deadly weapon, and (5) the unique elements of count I requiring bodily injury and a prior conviction of family violence cannot be considered the same as the unique elements of count II requiring threat with a deadly weapon.  *See* TEX. PENAL CODE

---

[8]"What the State could have charged . . . does not factor into a reviewing court's determination, and cannot serve as the basis of a double-jeopardy violation." *Garfias*, 424 S.W.3d at 62.

14

ANN. §§ 22.01(a), (b); 22.02(a), (b); *Garfias*, 424 S.W.3d at 60. In the absence of express legislative intent, the focus or gravamen of an offense best describes the allowable unit of prosecution. *Garfias*, 424 S.W.3d at 61. As in *Garfias*, because the focus or gravamen of the alleged offenses differs, we find that the unit-of-prosecution determination indicates that the Legislature intended to allow Perry's multiple punishments. *See id.*

Where, as here, "the Legislature specifically authorizes multiple punishments under two statutes, even if those two statutes proscribe the same conduct, 'a court's task of statutory construction is at an end[,] and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.'" *McCrary*, 237 S.W.3d at 172 (quoting *Hunter*, 459 U.S. at 368–69). We find that Perry was not subjected to double jeopardy prosecutions for, convictions of, or punishments for assault family violence with a prior conviction for family violence and aggravated assault with a deadly weapon. *See Childress v. State*, 285 S.W.3d 544, 549–550 (Tex. App.—Waco 2009, pet. ref'd) (concluding that the Legislature intended to treat dating violence assault and aggravated assault as separate offenses). Consequently, we overrule this point of error.

### 3. Perry Was Not Entitled to any Lesser-Included-Offense Instruction

Our review of alleged jury-charge error involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009); *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). Initially, we determine whether an error occurred, and then "determine whether sufficient harm resulted from the error to require reversal." *Abdnor*, 871 S.W.2d at 731–32; *Almanza v. State*, 686 S.W.2d

15

157, 171 (Tex. Crim. App. 1984) (op. on reh'g), *reaff'd by Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003).

The assault statute sets out three separate and distinct assaultive crimes: bodily-injury assault, assault by threat, and offensive-contact assault. *See* TEX. PENAL CODE ANN. § 22.01(a)(1)–(3); *Landrian v. State*, 268 S.W.3d 532, 536, 540 (Tex. Crim. App. 2008). During the charge conference, Perry asked that the court include, as lesser-included offenses, assault by threat and offensive-contact assault. *See* TEX. PENAL CODE ANN. § 22.01(a)(2)–(3). Perry argues that the trial court's failure to include these lesser-included offenses was erroneous.

Before being required to submit a lesser-included charge, the court must conclude (1) the requested charge is for a lesser-included offense of the charged offense and (2) there is some evidence that, if the defendant is guilty, he or she is guilty only of the lesser offense. *Guzman v. State*, 188 S.W.3d 185, 188 (Tex. Crim. App. 2006) (citing *Hayward v. State*, 158 S.W.3d 476, 478 (Tex. Crim. App. 2005); *Campbell v. State*, 149 S.W.3d 149, 153 (Tex. Crim. App. 2004)).

An offense is a lesser-included offense if:

> (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;
>
> (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;
>
> (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or
>
> (4) it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX. CODE CRIM. PROC. ANN. art. 37.09 (West 2006).

Count I of the indictment alleged that Perry caused McKinney bodily injury by hitting her with his hand, that McKinney was a member of the household, and that, previously, Perry had been convicted of family violence.[9] As submitted to the jury, count II alleged assault by threat, plus the use or exhibition of a deadly weapon. "[T]he pleadings approach is the sole test for determining in the first step whether a party may be entitled to a lesser-included-offense instruction." *Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007). Thus, the first step involves a question of law that does not depend on the evidence to be produced at trial. *Id.* at 535–36. We look to the allegations in the indictment to ascertain whether Perry was entitled to the requested lesser-included offenses.

Perry requested submission of offensive-contact assault as a lesser-included offense. *See* TEX. PENAL CODE ANN. § 22.01(a)(3). Offensive-contact assault requires a finding that a person "intentionally or knowingly caused physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative." TEX. PENAL CODE ANN. § 22.01(a)(3). In proving either under count I that Perry hit and caused bodily injury to McKinney, or under count II that Perry threatened bodily injury with a deadly weapon, the State was not required to prove that Perry knew or should have reasonably believed that McKinney would regard the action as offensive or provocative. *See McKithan v. State*, 324 S.W.3d 582, 591 (Tex. Crim. App. 2010). Therefore, offensive-contact assault would not be established by proof of the same or less than all the facts required to establish the commission of

---

[9]Only a bodily-injury assault can be elevated from a misdemeanor to a third degree felony on a finding that the assault was committed by a household member and that the defendant was previously convicted of assault family violence. *See* TEX. PENAL CODE ANN. § 22.01(b)(2). Thus, the goal in requesting assault by threat and offensive-contact assault charges was to allow the jury to make a determination that, if Perry was guilty, he was guilty only of a misdemeanor.

17

the offense charged. *Id.* (concluding that offensive-contact assault was not a lesser-included offense of bodily-injury assault). Accordingly, offensive-contact assault was not a lesser-included offense of the charged offenses, and the trial court was not required to submit an offensive-contact assault charge. *See id.* (interpretation that offensive-contact assault was lesser-included offense of bodily-injury assault would undermine Legislature's intent to place three distinct criminal offenses in Section 22.01(a)).

Next, we address whether assault by threat is a lesser-included offense of the charged offenses. For guidance, we look to *Hall* and *McKithan*. In *Hall*, the Texas Court of Criminal Appeals found that aggravated assault by threat was not a lesser-included offense of murder because murder required an act that caused death, while the aggravated assault required evidence of a threat of imminent bodily injury to another. *Hall*, 225 S.W.3d at 536. As stated by *McKithan*, "*Hall*, therefore, decided that shooting and killing a person with a gun is not, in a step-one lesser-included-offense analysis, functionally equivalent to threatening that person with imminent bodily injury by displaying a gun." *McKithan*, 432 S.W.3d at 593 n.26. The State was not required to prove, in *Hall*, that imminent bodily injury was threatened even though the State's evidence may have shown assault by threat. *Id*. By analogy, assault by threat required proof that Perry threatened McKinney with imminent bodily injury, whereas assault causing bodily injury does not have elements of either a "threat" or "imminent bodily injury." Therefore,

18

assault by threat was not a lesser included charge under count I, since it required proof of more facts, not the same or fewer.[10]

Unquestionably, however, assault by threat is a lesser-included offense of the State's aggravated assault charge under count II. The key distinction between assault by threat, as requested by Perry, and aggravated assault by threat, as charged, is that an aggravated assault charge requires the State to establish that Perry used a deadly weapon during the commission of the assault, whereas a charge of simple assault by threat does not. *See* TEX. PENAL CODE §§ 22.01(a)(2), 22.02(a)(2). Therefore, we move to step two of the analysis.

We determine whether assault by threat is a valid rational alternative to the charged aggravated assault offense by determining whether the evidence could allow a jury to rationally conclude that, if Perry was guilty at all under count II, Perry was guilty only of assault by threat. *Wesbrook v. State*, 29 S.W.3d 103, 113 (Tex. Crim. App. 2000). "[I]n determining whether the second prong has been met, it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense, but rather, there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted." *Hampton v. State*, 109 S.W.3d 437, 441 (Tex. Crim. App. 2003).

Here, there must be some evidence suggesting that Perry did not use or exhibit a deadly weapon in the commission of the assault. Every witness present during the incident testified that Perry was holding a steak knife when he kicked down McKinney's door. While some witnesses

---

[10]We previously ruled on this issue in *Moore v. State*, No. 06-08-00070-CR, 2008 WL 4613843, at *2 (Tex. App.—Texarkana Oct. 20, 2008, no pet.) (mem. op., not designated for publication). Although this unpublished case has no precedential value, we may take guidance from it "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

19

testified that Perry held the knife to his side after his entry, each witness confirmed that Perry continued to wield the knife during a portion of the altercation with McKinney and that McKinney grabbed the hand in which Perry was holding the knife, presumably to protect herself from injury.[11] Therefore, there was no evidence from which a rational jury could find that Perry did not use or exhibit a deadly weapon during the commission of the assault. Accordingly, the trial court was not required to submit a charge on simple assault by threat to the jury.

There was no error in the denial of Perry's requested assault by threat and offensive-contact assault jury charge submissions.

*4.    Evidence of Perry's Prior Offense of Family Violence Was Admissible*

Perry argues the trial court erred in admitting, during the guilt/innocence phase, a judgment demonstrating that he was previously convicted for family violence. At trial, Perry objected to the introduction of this previous judgment on the ground that it eviscerated his presumption of innocence. Perry also stipulated that he had committed the prior offense in an effort to remove the State's need for the prior conviction. After the State argued that the prior conviction was an element of the offense, the trial court overruled Perry's objection and admitted the judgment of conviction for family violence.

A trial court's decision to admit or exclude evidence is reviewed only for abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). A trial court does not abuse its discretion if the decision to exclude evidence is within the "zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on

---

[11]We have already determined that a steak knife, when wielded during an altercation, is, in the manner of its use or intended use, capable of causing death or serious bodily injury.

20

reh'g); *Marsh v. State*, 343 S.W.3d 475, 478 (Tex. App.—Texarkana 2011, pet. ref'd). So long as decisions fall within that zone, we may not substitute our own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

On appeal, Perry argues that the trial court erred in admitting the judgment because the prior conviction was not an element of the offense. Perry is incorrect. There are two principal ways in which a prior offense can be used by the State, either as a sentence enhancement during the punishment phase of trial or as a so-called "jurisdictional enhancement" that raises the degree of the offense. *See, e.g.*, *Harris v. State*, 204 S.W.3d 19, 24 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). This prior offense fulfilled the latter role, as a jurisdictional enhancement. Perry's previous conviction for assault family violence raised the level of his assault against McKinney from a class A misdemeanor to a third degree felony. *See* TEX. PENAL CODE ANN. § 22.01(b)(2). Because the prior conviction raised the level of the offense, it was a jurisdictional element of the offense that required a finding from the jury. *See Luna v. State*, 402 S.W.3d 849, 850 (Tex. App.—Amarillo 2013, no pet.); *Sheppard v. State*, 5 S.W.3d 338, 339–40 (Tex. App.—Texarkana 1999, no pet.) (citing *Gant v. State*, 606 S.W.2d 867, 871 n.9 (Tex. Crim. App. 1980)). Thus, no abuse of discretion in admitting the conviction has been shown.

*5.     Perry Was Not Entitled to a Mistrial Based on the State's Opening Statement Mentioning His Prior Family Violence Conviction*

During opening statement, the State told the jury, "We're also going to prove to you that he has a prior conviction. And during that I think that you're going to hear that the prior was against his sister." The trial court sustained Perry's generic objection to the statement. The court further instructed, "Ladies and gentlemen, the prior is only for jurisdictional purposes only, and you won't allow that to affect your decision other than to establish that there was a prior conviction if there was one." Perry, who failed to state the legal basis of his objection, then moved for a mistrial, which the court denied.

On appeal, Perry argues that the trial court erroneously denied his motion for mistrial. A trial court's ruling denying a motion for mistrial is reviewed for an abuse of discretion. *Duke v. State*, 365 S.W.3d 722, 727 n.9 (Tex. App.—Texarkana 2012, pet. ref'd) (citing *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009)). Perry's argument is based on the erroneous belief that the prior conviction was not admissible during guilt/innocence. Because, as explained above, the prior conviction was admissible during guilt/innocence, the trial court did not err in overruling Perry's motion for mistrial.[12]

---

[12]Perry stipulated to the existence of the prior conviction for family violence. Perry complains, for the first time on appeal, that the State referenced the victim of the prior conviction. There are several methods to proving prior convictions, including introducing testimony of the facts and circumstances of the prior conviction, which can include the name of the victim. *See Beck v. State*, 719 S.W.2d 205, 209 (Tex. Crim. App. 1986).

22

*6.     Admitting McKinney's Accusatory Statement Through Another Witness Was Not Error*

Over Perry's hearsay objection, the State was allowed to elicit testimony from Officer Williams that, on the scene in the immediate aftermath of the incident, McKinney told Williams that Perry had kicked the door down, had come at McKinney with a knife, had held a knife at her, had hit McKinney about eight times in the head, and had thus caused McKinney to feel pain on the side and back of her head. Williams testified that McKinney was shaking, crying, and "almost at one point hysterical." The State argued that McKinney's statements to Williams, made in this state of excitement, were admissible based on the excited-utterance exception to the hearsay rule.[13] Perry now complains that the court's ruling was in error.

"The admissibility of an out-of-court statement under the exceptions to the general hearsay exclusion rule is within the trial court's discretion."[14] *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). A reviewing court should not reverse unless a clear abuse of discretion is shown. *Id.*

An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." TEX. R. EVID. 803(2); *see Zuliani*, 97 S.W.2d at 595; *Salazar v. State*, 38 S.W.3d 141, 154 (Tex. Crim. App. 2001). The basis for the excited-utterance exception is "a psychological one, namely, the fact that when a man is in the instant grip of violent emotion, excitement or pain, he ordinarily

---

[13]The State also argued that Williams' recollection of McKinney's statements to her impeached McKinney's testimony that she was not in any physical pain and did not feel threatened by Perry.

[14]"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX. R. EVID. 801(d). For hearsay to be admissible, it must fit into an exception provided by a statute or the Texas Rules of Evidence. TEX. R. EVID. 802.

loses the capacity for *reflection* necessary to the fabrication of a falsehood and the 'truth will come out.'" *Zuliani*, 97 S.W.3d at 595 (quoting *Evans v. State*, 480 S.W.2d 387, 389 (Tex. Crim. App. 1972) (emphasis added)).

On appeal, Perry argues that McKinney's statements were not excited utterances because McKinney had an opportunity for calm reflection while she waited for police to arrive. He adds that McKinney first had the opportunity to talk to Johnson and that, while McKinney could be heard in the background of the 9-1-1 call, it did not appear that she was upset or hysterical.

The critical determination when deciding whether to apply the excited-utterance exception is "whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event" or condition at the time of the statement. *Id.* at 596. If the statement was made "under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection," abuse of discretion in admitting the statement cannot be shown. *Id.*

Despite Perry's assertions that McKinney had the opportunity to calm down, the evidence showed that she had not. As suggested by McKinney's shaking, crying, and declarations of pain to Williams and Johnson, the attack was a startling event. Perry was still on the premises when Williams arrived. Williams, who interviewed McKinney shortly after the 9-1-1 call was made, testified that McKinney was in an excited state during the interview. McKinney herself stated that she was "mad and upset that night" when she was speaking to Williams. Based on this evidence, the trial court found that McKinney was still dominated by the emotions produced by Perry's attack.

24

Because the trial court's decision to admit McKinney's statements to Williams under the excited-utterance exception to the hearsay rule is supported by the record, no abuse of discretion has been shown. *See Marsh*, 343 S.W.3d at 478 (quoting *Montgomery*, 810 S.W.2d at 391). We overrule Perry's complaint on this point.

7.    *No Error Was Preserved Regarding the Claimed Breach of Agreement Regarding the Knife*

Perry also argues that the State committed prosecutorial misconduct when it introduced a knife to be used for demonstrative purposes because, in doing so, it violated an agreement regarding the suppression of the knife. Because the parties' agreement was allegedly violated, Perry argues that the trial court erred in admitting the demonstrative knife. Our review of the record reveals that Perry has failed to preserve these points.

Perry filed a generalized motion to suppress any evidence obtained during an illegal search or seizure. That motion was never heard or ruled on by the court. The record memorializes the events and alleged agreements as follows:

> [The State]:    Okay. We . . . were scheduled for a Motion to Suppress yesterday. It did not go through. I didn't know if we want to put something on the record.
>
> THE COURT:        Y'all have an agreement on that?
>
> [Defense counsel]:    We do, Your Honor. Since it's my motion I don't mind stating what I understand the agreement to be. We had a Motion to Suppress evidence that was scheduled for hearing yesterday afternoon at 3 o'clock. Specifically, . . . what the Motion to Suppress involved, there was an immediate detention of the defendant by the officer when she arrived at the scene that we're going to hear the evidence about today . . . .
> At some point a backpack that allegedly the defendant had was searched and there was a steak knife that was found in the backpack. And it was taken into evidence and there was some indication that that potentially could have been used

25

as evidence in this case. And our basis for the Motion to Suppress was we feel like it was inappropriately seized and the backpack was inappropriately searched. . . . After we selected the jury on Monday, January -- February 25th, [the State] called me on my cell phone as I was headed home and [it] indicated that they didn't want to agree to the Motion to Suppress. However, they would agree not to ask about the knife. They would also -- and I assume the search of the backpack, that was the only thing that was found. And they would not try to introduce the steak knife at trial or refer to it in any way. In return they asked that I not say anything in argument or ask the police officer about, "Well, did you find a knife," or argue to the jury, "Where is the knife?"

And I agreed to that. I agree to it still. I visited with Mr. Perry about, that yesterday, and he's fine with that. Obviously, we can still ask questions about whatever weapon the witnesses described and make appropriate arguments about that, but I certainly have no problem with upholding the agreement that we made.

. . . .

[The State]:    That's correct, Your Honor. We are agreeing not to, with the police officer, go into the search of the backpack or the fact that the knife was found in the backpack. We will go into questions in regards to the knife with the witnesses. And also just for -- before we get into it, we do have a knife that we plan on using for demonstrative purposes only, asking the witnesses if it appears to be similar to the knife that they saw that particular night.

Perry argues that the State committed prosecutorial misconduct when it "blatantly undid the agreement with counsel on important discovery and . . . was less than candid with the trial court in [its] reasons for doing so." Perry's point of error does not complain of any action by the trial court. This is because Perry did not raise and did not secure a ruling on this ground of alleged prosecutorial misconduct. To preserve a complaint for appellate review, the complaining party must make a specific objection and obtain a ruling on the objection. *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002); *see*

26

Tex. R. App. P. 33.1(a). Because Perry did not present his complaints to the trial court,

the issue of prosecutorial misconduct is not preserved for our review.[15]

Perry did, however, complain of the use of the demonstrative knife. Once Perry

was informed of the State's intent to use the demonstrative knife, the following

discussion occurred, indicating Perry's objection:[16]

> [Defense counsel]:     I don't know that I've seen that knife.
>
> [The State]:     You haven't.
>
>     . . . .
>
> [Defense counsel]:     If I may add, this is the first time I've seen this particular knife. I don't know where that knife came from. I wonder if that can be placed on the record?
>
> THE COURT:     That's not a piece of evidence found in connection with this case?
>
> [The State]:     No. Although it is -- I can tell the Court that it's exact -- similar except it's missing one little silver piece in the handle. It came from our Investigator Hall Reavis' home. He looked at the one and said he had one just like it. He brought it yesterday from home. We plan on using it.
>
> Your Honor, I've already spoke to the witnesses telling them not to mention anything about the search of the backpack if they even did know. I spoke to the officer. But I have shown them this and asked them if it looked similar to -- similar in size, shape and color to the one that they saw Mr. Perry had that particular night.

---

[15]In any event, the transcript above demonstrated that the State agreed only to refrain from questioning the arresting officer about the knife found in the backpack, from offering the actual knife used in the assault, and from introducing evidence that a knife was found in Perry's backpack. Perry's comments indicated agreement that the parties could question witnesses about the knife for the purposes of describing the knife and how it was used. The State indicated its intention to use the demonstrative knife and ask whether it was similar to the one used by Perry during the incident.

[16]The transcript demonstrates that Perry failed to suggest that the State's intended use of the demonstrative knife would violate any agreement between the parties.

27

THE COURT: Well, that's really not part of the agreement. You could lodge an objection if you wish to at an appropriate time, correct?

[Defense counsel]: And I will, Your Honor. I will do that . . . .

THE COURT: I think it's good to place all that on the record, but it is a separate issue.

[The State]: Yes. But I just want to let him know before we get into trial.

The discussion ended without either an expression of the legal basis of the objection to the demonstrative knife or a ruling. Then, during Johnson's direct examination by the State, the following objections and arguments were presented:

Q. . . . Okay. I'm going to show you what's been marked State's Exhibit 1 for demonstrative purposes. Does this -- even though this is not the one, does this appear to be similar in nature that he had when he came in the room?

A. Yes, ma'am.

Q. And can you hold that and show us how he was holding the knife when he came in the room?

A. He was holding it like-he was going to stab --

THE COURT: Hold on . . . .

[Defense counsel]: Judge, I'm going to object to this this is the knife -- this knife was provided just before court this morning. We object that's improper notice of the intended use of that matter. Further, if she's going to ask her to display it to the jury, it's not even been offered at this point.

THE COURT: I'm going to overrule the first part of your objection. I think we need to get it offered for demonstrative purposes first if we're going to use it.

[The State]: State would offer State's Exhibit 1 for demonstrative purposes only.

28

[Defense counsel]: We make the same objection.

THE COURT: Overruled.

After the demonstrative knife was admitted, Ayers, Neal, and McKinney also testified, over objection, that the demonstrative knife was similar to the knife Perry used during the assault.

Perry's objection to the admission of the knife at trial was only that he had not been given prior notice of its use and that the State was showing the exhibit to the jury even though it had not been admitted. On appeal, however, Perry argued that the trial court erred in admitting the demonstrative knife because (1) the ruling had the effect of revoking the parties' agreement and (2) the demonstrative knife should not have been used because the original knife was available. The point of error on appeal must comport with the objection made at trial. *See Swain v. State*, 181 S.W.3d 359, 367 (Tex. Crim. App. 2005); *Wilson*, 71 S.W.3d at 349. Because Perry's complaints on appeal were not asserted below, they do not comport with his objections at trial, and nothing is preserved for our review. *See Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009).

We overrule Perry's points of error complaining of the State's use and the trial court's admission of the demonstrative knife because he has failed to preserve them.[17]

---

[17]It is noted, however, that this use of the knife is what was explicitly mentioned when the agreement was stated on the record.

*8.* *No Error Was Preserved Regarding the Lack of a Jury Instruction Regarding the Knife*

Citing to *Miskis v. State*, Perry argues that an instruction to the jury limiting the purpose for which they could consider the demonstrative knife was mandatory. *Miskis v. State*, 756 S.W.2d 350, 352 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd). In relevant part, *Miskis* stated,

> An object, which is not an exact replica of the original used in the commission of a crime, may be admissible if: . . . the jury is instructed that the object is not the object used in the commission of the crime, and is to be considered by the jury solely as evidence that demonstrates or illustrates what the object used in the offense looks like.

*Id.* In support of the jury instruction requirement, *Miskis* cited to *Simmons v. State*, 622 S.W.2d 111, 114 (Tex. Crim. App. 1981). However, our review of *Simmons* fails to uncover any announcement that a court is required, *sua sponte*, to provide a limiting instruction on the use of demonstrative evidence in the jury charge. *See Onwukwe v. State*, 186 S.W.3d 81, 85 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

Of course, a trial court should give a limiting instruction when requested. *Id.* But here none was requested. Because Perry did not ask the trial court to give a limiting instruction, he cannot now complain of a lack of a jury instruction about the demonstrative knife. *See* TEX. R. EVID. 105(a); *Onwukwe*, 186 S.W.3d at 85; *see also* TEX. R. APP. P. 33.1(a). We overrule this point of error.

*9.     Perry's Sentences Were Not Constitutionally Excessive*

Perry argues that the trial court erred in denying his motion for new trial, which argued that his sentences constituted cruel and unusual punishment because they were disproportional to the offenses committed.  *See* U.S. CONST. amend. VIII; TEX. CONST. art. 1, § 13.

The Legislature is vested with the power to define crimes and prescribe penalties.  *See Davis v. State*, 905 S.W.2d 655, 664 (Tex. App.—Texarkana 1995, pet. ref'd).  "Texas courts have traditionally held that, as long as the punishment assessed is within the range prescribed by the Legislature in a valid statute, the punishment is not excessive, cruel, or unusual."  *Williamson v. State*, 175 S.W.3d 522, 524 (Tex. App.—Texarkana 2005, no pet.) (citing *Jordan v. State*, 495 S.W.2d 949, 952 (Tex. Crim. App. 1973)).  It is undisputed that Perry's enhanced sentences are within the allowable range of punishment.  However, "a prohibition against grossly disproportionate punishment survives under the Eighth Amendment to the United States Constitution apart from any consideration of whether the punishment assessed is within the range established by the Legislature."  *Id.*; *see Mullins v. State*, 208 S.W.3d 469, 470 (Tex. App.—Texarkana 2006, no pet.) (citing U.S. CONST. amend. VIII; *Solem v. Helm*, 463 U.S. 277, 290 (1983); *see generally Harmelin v. Michigan*, 501 U.S. 957 (1991)).

The claim of disproportionate sentencing is derivative of the proscription by the Eighth Amendment of cruel and unusual punishment and "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned'" to both the offender and the offense.  *Winchester v. State*, 246 S.W.3d 386, 388 (Tex. App.—Amarillo 2008, pet. ref'd) (quoting *Atkins v. Virginia*, 536 U.S. 304, 311 (2002)).  The prohibition against grossly

31

disproportionate sentences is applied "only in the 'exceedingly rare' and 'extreme' case." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Harmelin*, 501 U.S. at 1001) (Kennedy, J., concurring)).

To address Perry's complaint, we first make an initial threshold comparison of the gravity of the offenses to the severity of the sentences. *Mullins*, 208 S.W.3d at 470. Then, "only if that initial comparison create[s] an inference that the sentence was grossly disproportionate to the offense should there be a consideration of . . . (1) sentences for similar crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions." *Id*. (citing *McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992); *Dunn v. State*, 997 S.W.2d 885, 892 (Tex. App.—Waco 1999, pet. ref'd); *Lackey v. State*, 881 S.W.2d 418, 420–21 (Tex. App.—Dallas 1994, pet. ref'd)).

Perry assaulted a household family member and threatened her with a deadly weapon. Perry was convicted of third and second degree felonies, which were both enhanced by two prior felony offenses. *See* TEX. PENAL CODE ANN. § 12.42(d) (West Supp. 2014). Pursuant to Section 12.42(d), Perry was to be punished by imprisonment for life, or for any term of not more than ninety-nine years or less than twenty-five years. *Id.* In addition to his prior misdemeanor conviction for assault family violence, the State presented evidence that Perry had previously been convicted of (1) six felony offenses,[18] including delivery of marihuana, attempted assault on a public servant, two counts of unauthorized use of a motor vehicle, possession of a controlled substance, theft of property in an amount of $1,500.00 or more but less than $20,000.00, and

---

[18]Three of the six felony offenses were state jail felonies.

tampering with physical evidence, and (2) seventeen misdemeanor offenses, including assault by kicking, DWI, evading detention, theft, theft of service, three counts of driving while license suspended, possession of marihuana, failure to identify, two counts of resisting arrest, four counts of criminal trespass, and criminal mischief. Perry's sentence fell in the middle of the range of imprisonment allowed. Considering the gravity of Perry's offenses and the record in this case, which included Perry's extensive criminal history, we determine that nothing demonstrates or raises an inference that the sixty-year sentences were grossly disproportionate to the offenses or that this is an exceedingly rare and extreme case. Accordingly, Perry's sentences did not constitute cruel and unusual punishment.[19]

*10.    No Ineffective Assistance of Counsel Was Shown*

Perry argues that his counsel was ineffective because he (1) failed to pursue Perry's motion to suppress the knife based on the State's agreement, (2) did not request a limiting instruction with respect to the demonstrative knife, and (3) failed to hire an investigator to reveal the identity of the unidentified man who witnessed the altercation but left before officers arrived.

To show ineffective assistance of counsel, a defendant must demonstrate both (1) that his counsel's performance fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984); *Ex parte Imoudu*, 284 S.W.3d 866, 869 (Tex. Crim. App. 2009). Failure to make either one of these required

---

[19]The record also included two Gregg County District Court judgments recording convictions by juries for aggravated assault with a deadly weapon with enhanced sentences. The defendant in the first case received a sentence of fifty years' imprisonment, and the defendant in the second case received a sentence of seventy-five years' imprisonment.

showings defeats an ineffectiveness claim. *See Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *Ex parte Martinez*, 195 S.W.3d 713, 730 n.14 (Tex. Crim. App. 2006).

We begin our analysis with the rule that any allegation of ineffectiveness of counsel must be firmly founded in the record. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999); *Wallace v. State*, 75 S.W.3d 576, 589 (Tex. App.—Texarkana 2002), *aff'd*, 106 S.W.3d 103 (Tex. Crim. App. 2003). From the record, which does not include an explanation of counsel's reasoning, Perry bears the burden of proving by a preponderance of the evidence that counsel was ineffective.[20] *Goodspeed*, 187 S.W.3d at 392; *Thompson*, 9 S.W.3d at 813; *Cannon v. State*, 668 S.W.2d 401, 403 (Tex. Crim. App. 1984). Rarely will a reviewing court be provided a record on direct appeal that allows for a comprehensive evaluation of the merits of an ineffective assistance of counsel claim. *Thompson*, 9 S.W.3d at 813. "In the majority of instances, the record on direct appeal is simply undeveloped and cannot adequately reflect" the reasoning of trial counsel. *Id.* at 813–14.

With respect to the first *Strickland* prong, there is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that the challenged action could be considered sound trial strategy. *Strickland*, 466 U.S. at 689; *Ex parte White*, 160 S.W.3d 46, 51 (Tex. Crim. App. 2004); *Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). Therefore, we will not second-guess the strategy of Perry's counsel at trial through hindsight. *Blott v. State*, 588 S.W.2d 588, 592 (Tex. Crim. App. 1979); *Hall v. State*, 161 S.W.3d 142, 152 (Tex. App.—Texarkana 2005, pet. ref'd).

---

[20]Although the trial court heard Perry's motion for new trial, Perry presented no complaint or evidence relating to ineffective assistance.

From the record, it appears that counsel did, in fact, schedule a hearing on the motion to suppress. The hearing was cancelled after the State agreed to the motion, which was designed to suppress the actual knife and the fact that officers found the knife in Perry's backpack. Thus, Perry received the relief he requested, and it was perfectly reasonable for counsel to conclude that no hearing was required in light of the agreement.

Next, counsel would have been entitled to an instruction about the demonstrative knife had it been requested. *See* TEX. R. EVID. 105(a). But the failure of defense counsel to request a limiting instruction is not, by itself, ineffective assistance. *Agbogwe v. State*, 414 S.W.3d 820, 832 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Ali v. State*, 26 S.W.3d 82, 88 (Tex. App.—Waco 2000, no pet.). When the knife was offered, and each time the knife was shown to a witness, the State stated that the demonstrative knife was not the actual knife used. Counsel could have concluded that the instruction would have been cumulative of the State's representations. It was reasonable for counsel to believe that the jury did not have to be further instructed that the demonstrative knife was not the actual knife and that it was being used for demonstrative purposes only.[21]

Perry also argues that his counsel was ineffective because he failed to hire an investigator to identify and locate the unnamed witness. The record has no indication, however, that the identity of the unnamed witness was unknown to counsel. Perry could have easily revealed the man's name to his counsel. There is also no evidence that counsel failed to interview the unnamed person. It is possible that counsel did not ask for an investigator because the testimony

---

[21]Perry fails to argue how the failure to request a limiting instruction harmed him.

of the man would not be favorable to Perry. "[A] claim for ineffective assistance based on trial counsel's failure to interview a witness cannot succeed absent a showing of what the interview would have revealed that reasonably could have changed the result of the case." *Stokes v. State*, 298 S.W.3d 428, 432 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd).

We can visualize reasonably sound possible motivations behind counsel's failure to continue with a hearing on an agreed motion to suppress, request a cumulative limiting instruction, and seek the appointment of an investigator in the absence of any suggestion that information gathered would be helpful to Perry's case. Therefore, Perry has not met the first *Strickland* prong, and his point of error complaining of ineffective assistance is overruled.

*11. Attorney Fees Must Be Removed from the Judgment*

A claim of insufficient evidence to support court costs and court-appointed attorney fees is reviewable on direct appeal. *Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010). Perry complains of the trial court's assessment of the $10,000.00 fines on each count and order to pay $324.00 court costs and $5,100.00 in attorney fees. The State concedes that Perry is indigent and that the record has no finding by the trial court that he had financial resources or was otherwise able to pay the appointed attorney fees. *See Wiley v. State*, 410 S.W.3d 313, 317 (Tex. Crim. App. 2013).

We have previously held that court costs may be recovered from indigent defendants. *Allen v. State*, 426 S.W.3d 253, 258–59 (Tex. App.—Texarkana 2013, no pet.). Additionally, while the Texas Code of Criminal Procedure requires a trial court to determine whether a defendant has financial resources that enable him or her to offset in part or in whole the cost of

36

appointed counsel, the Legislature has not preconditioned the collection of fines on a defendant's ability to pay. *See* TEX. CODE CRIM. PROC. ANN. art. 26.05(g) (West Supp. 2014); *Beshirs v. State*, No. 06-12-00108-CR, 2013 WL 1750890, at *3 (Tex. App.—Texarkana Apr. 24, 2013, no pet.) (mem. op., not designated for publication); *Johnson v. State*, No. 12-12-00263-CR, 2013 WL 2286077, at *2 (Tex. App.—Tyler May 22, 2013, no pet. h.) (mem. op., not designated for publication).[22]

A trial court has the authority to order the reimbursement of court-appointed attorney fees only if "the court determines that a defendant has financial resources that enable him to offset in part or in whole the costs of the legal services provided, including any expenses and costs." TEX. CODE CRIM. PROC. ANN. art. 26.05(g). "'[T]he defendant's financial resources and ability to pay are explicit critical elements in the trial court's determination of the propriety of ordering reimbursement of costs and fees'" of legal services provided. *Armstrong v. State*, 340 S.W.3d 759, 765–66 (Tex. Crim. App. 2011) (quoting *Mayer*, 309 S.W.3d at 556).

Here, the assessment of attorney fees was erroneous and should be removed. *See generally Mayer*, 309 S.W.3d 552; *Shelton v. State*, No. 06-13-00049-CR, 2013 WL 4506984, at *1 (Tex. App.—Texarkana Aug. 22, 2013, no pet.) (mem. op., not designated for publication); *Taylor v. State*, No. 02-12-00106-CR, 2013 WL 978842, at *1 (Tex. App.—Fort Worth Mar. 14, 2013, pet. struck) (mem. op., not designated for publication). We sustain Perry's last point of error and modify the trial court's judgment by deleting the assessment of attorney fees.

---

[22]Although unpublished cases have no precedential value, we may take guidance from them "as an aid in developing reasoning that may be employed." *Carrillo*, 98 S.W.3d at 794.

We modify the trial court's judgment by deleting the assessment of attorney fees and affirm the judgment, as modified.


Josh R. Morriss, III
Chief Justice

Date Submitted:     April 8, 2014
Date Decided:       August 15, 2014

Do Not Publish